and the MAA Trust. With the Court's permission, I'd like to reserve three minutes of rebuttal as well. All right. Your Honors, I'd like to start with the three questions that were posed by this Court in advance of argument. First, the District Court was required to make factual findings as to causation prior to awarding disgorgement in this case. District Courts do not have equitable power to award disgorgement without causation. And for that reason, District Courts typically do make factual findings of some causal link between the violation and the profits that they're ordering disgorged. Is there any way to read what the District Court said as implicitly hitting that causal connection and commenting on it? I don't believe there is, Your Honor. What the District Court did here was not to make a factual finding of causation, but rather to draw on a series of inapplicable presumptions from cases that were not addressing the threshold issue of whether there was a causal link between the violation and profits. But the second step of that analysis, where there already was established a causal link, or it wasn't even a question in the case, to move on to the amount of disgorgement, that is, how much of the profits were attributable to the violation. And the statements that the Court makes and draws on reflect exactly that presumption. For example, the presumption that all profits from a tainted transaction approximate unjust enrichment, or in adopting the theory that the SEC urged below and continues to urge on appeal, which is that all profits that are gained during a period of violation constitute ill-gotten gains and are subject to disgorgement. That is not a factual finding. That is, in fact, a theory of strict liability. And it is one that has no support whatsoever in the most dispositive case here, while not controlling on this circuit, but certainly persuasive, is Willman v. Dickinson, where the fact pattern is identical to that which is presented here. As to the case that was before her, Judge Wiginton simply stated that she could not speculate how disclosure, that is, the correction of a violation, not even the violation itself, would have affected the market for music land stock or the poison pill, and observed that several scenarios were possible, including that nothing could have happened. And she then went on to reject the idea that the tender offer was an intervening event on the ground that, in the Court's view, the tender offer was a, quote, market correction that Tio anticipated when he bought what he considered to be undervalued shares. That is the sum of the District Court's supporting a $50 million judgment here. Okay. I think we got you on that point. And I would note, Your Honor, that before asking how much a disclosure violation affected market price, courts must address the threshold question of whether there was any unjust enrichment at all. The third question that was presented by this Court is, what is the causal connection here between the alleged disclosure violations and the amount of profits ordered disgorged? And of course, the amount that we are discussing here is $17.4 million ordered in disgorgement, which in turn generated a civil penalties order of $17.4 million and prejudgment interest award of $14.6 million. So in essence, there's $50 million that is tied to this causation question. And there are four critical, undisputed facts. First, what actually caused the profits here, the rise in stock price, was the tender offer that was announced by Best Buy in December of 2000. That was approximately two and a half years after Mr. Tio allegedly began undisputed reporting his ownership of music land stock. Could it not be so that, looking at the poison pill provision, above 17.5%, he was above that. Couldn't it be argued that because of his misrepresentations, that was not invoked and all of the profits are attributable to his non-disclosure? Your Honor, it cannot. The poison pill here was not a cap. It was not a bar on continuing to make purchases. And the record is also clear on that indeed. It's telling, the SEC is citing to support outside the record in footnote 10 of its brief. The poison pill is a private contractual arrangement. And there are numerous ways to enforce that through private litigation. Indeed, the shareholder's rights agreement itself provides in section 15, which is a joint appendix 822, for civil remedies for enforcement of that provision. But the question that's being put to you, Ms. Krass, is it's true it could have been enforced and maybe it would have been enforced and maybe it wouldn't have been enforced. But the question is, since Mr. Tio didn't disclose, and apparently quite deliberately didn't disclose, and was hiding his hand in this regard, is it appropriate under existing precedent to say, well, we don't have to delve deeply into the causal link. It's enough for us to recognize the disclosure violation and say that the profits that you gain are illicit because of your violation? No, Your Honor. That wouldn't be sufficient for a number of reasons. Because what are you relying on as law to say, because I'm probably doing a poor job of describing the SEC's position, but I kind of take that to be their point, which is, he did a wrong thing. He, in fact, pled guilty to doing a wrong thing. And the benefits he got of stock appreciation ought to be attributed to the wrong thing. What's wrong with that reasoning? First, Your Honor, of course, it was not a cap. So we're talking about the wrong thing as in not having the information available for management. The wrong thing was he didn't disclose. That's right, Your Honor. And the violation is a 13D violation. It's a failure to disclose ownership of stock. Well, it's more than that, and a failure to disclose his intent to what he intended to do with it, right? That was the premise for the 13D violation, Your Honor, although it did not find its way into any discussion of disgorgement, I would note, by Judge Wiginton. But the theory that's put forward by the SEC here is not one that is tied to the violation of 13D, which is a disclosure violation. And for there to be some link between the failure to make a disclosure and the profits is not a question that can turn on hypotheticals about what might happen, what could have happened. It turns on actual market events. And every case that has addressed the question of disgorgement has looked to what actually happened. For Citi Financial, that was an artificially... So stick to this case. What is it that actually happened here that prompts you to say a disgorgement theory can't properly lie? It just can't exist with these facts? Because the only facts here, Your Honor, are that what caused the rise in market price was the Best Buy tender offer, that Mr. Teo had no involvement whatsoever in procuring that tender offer, and in fact wasn't even aware of the negotiations until their end stages. Did his efforts to shop the company or try to take it private, can they be viewed as in any way influencing the Best Buy price and contributing to the profits he got? No, Your Honor. There's no suggestion in a fully developed record at trial that there was any connection between the exploration that Mr. Teo was doing about possibilities with the company and Best Buy coming in with its tender offer. It was something he didn't even know about until the very end. The question isn't necessarily whether he knew about it, it's whether Best Buy knew about it, right? If Best Buy, through Musicland, knew about his efforts and they were communicating to Best Buy in some fashion, look, you're going to have to beat the price that's being brought to us by one of our major shareholders. Is that a causal connection? No, Your Honor. Here, Mr. Teo certainly did bring along members of management at different points to meetings, and as they described the nature of those meetings with various firms, it was not even about taking the company private, it was simply exploring different options to maximize shareholder value. What does that mean, maximize shareholder value? Is he trying to cash out in some way, trying to bring somebody else in, bring money in? He was looking at a variety of different options and encouraging management to consider them, and management did not pursue any of the very preliminary options that he had put before them. Instead, out of the blue, Best Buy approached the company, and those negotiations ensued leading to the announcement in December of 2000. It cannot be, Your Honors, that the hypothetical of what might have happened is a sufficient basis for a finding of causation to award disgorgement. There are limits to the court's equitable power, and that requires that there be actual causation. There can be no dispute on this record that there is one actual but-for cause of the rise in market price, and that was the Best Buy tender offer. And the theory that the SEC has put forward and that has been adopted by the district court, this idea that while you are engaged in other wrongdoing, while you are in violation of the law for failure to disclose, that any gains during that time are ill-gotten gains, also can't be the law. That is a theory of strict liability. It is taking the disclosure provisions of 13D, which are numerous, for example, a requirement of disclosure of the citizenship and background and identity of those for whom shares are purchased, of course plans and proposals, of the financial arrangements that are behind a tender offer, of any joint ventures or other agreements that are in place. Under the SEC's theory, if someone fails to disclose the true citizenship of a beneficiary and the market independently goes up in that category, they would espouse the position that there is disgorgement required. Those are ill-gotten gains. That eliminates causation entirely. It is also, Your Honors, contrary to the language of 13D in the sense that it is not something that penalizes purchases. Well, we'll hear you on, we can hear you on rebuttal. We've got your argument in this case. Mr. Licitiza. Licitza. Okay. May it please the Court, David Licitza for the Securities and Exchange Commission Appellee. Before I address the Court's question regarding disgorgement, can you please permit me to make two very brief points with respect to that issue. First, the jury found that Teal committed fraud. This is not simply a case of failing to make proper filings. It is also a case of fraudulent securities transactions. And secondly, the District Court did not abuse its discretion requiring disgorgement from fraudulent transactions as a form of equitable relief. Okay. Well, that's really the question we're trying to get at with our letter. And so maybe you could start by responding to Ms. Krause's argument that there has to be, as a matter of law, a causal link between the disclosure violation and the supposedly ill-gotten gains in order for there to be disgorgement. And that absent the causal link, disgorgement can't lie because then you're no longer talking about an equitable remedy. You're talking about punitive measures, and that's not what disgorgement is about. I understand that to be their argument, and I'm very interested in your response. Well, it's important that it's not just a disclosure violation, Your Honor. Teal's profits flowed from fraudulent transactions. You can hang whatever label you want on it. The question is, does there have to be a causal link between what he's alleged to have done and the money he got? Yes. If the transaction was fraudulent, it is unlawful. He could not engage in that transaction. So the causal link is any profit from that transaction. Well, isn't that the very point when you say all profits from that transaction? Yes. Because it's SEC's position that there could never be an independent, like if somebody walked in off the street and said, I'm going to give you a hundred times the face value or the current trading value of that stock. Has nothing to do with you. I just love this company. That because of fraud that might have been committed by that person to whom the offer is made, that's all subject to disgorgement? Let me give you three answers. The first answer is just yes, outright. It's a prohibited transaction. What is the prohibited transaction? To accept an offer from a third party who knows nothing or has nothing to do with your fraud? If the shares were procured by fraud, any subsequent increase in market value has to be disgorged. The second, though, point that I would make is that the district court found the Best Buy offer constituted the kind of market correction that Teal anticipated. Let's deal with your first point. Yes. What is your authority for the position? We're not talking about insider trading here, right? It is very much akin to insider trading, Your Honor. But we're not talking about insider trading. We're talking about 13B, correct? 10B. It's a 10B violation, Your Honor. The jury found a 10B violation. It's not just a failure to disclose. In a world without 10B, Your Honor. Was I, was I, am I mistaken in understanding that the disgorgement was pinned to the 13B violation? I could be, but I thought that was. It is certainly not restricted to the 13B violation, Your Honor. The jury found fraud. This is a fraud case. The court, the district court found that Teal acquired the shares through fraud. He says that he rejects any contests to the, to the 10B. Which, which shares? All the shares he owned? All the shares that were purchased after the start of his disclosure, at the start of his fraud in July of 1998. Then his fraud continues. He doesn't just say. The district court, did the district court do anything to, to narrow the disgorgement to shares supposedly acquired after that day? Yes, absolutely, Your Honor. And, and, and explain what they did and how the district court drew a causal link. Shares that were acquired, and there were, there was a huge block of shares acquired before the fraud began. Shares that were acquired before the fraud began. The district court said, well, he sold those shares. The calculation by the SEC is that he sold those shares after the fraud began. However, the way that disgorgement is calculated was he gets to keep profits on any of those shares that he sold, even if they were sold after the fraud began. And what the accountant did, what our expert accountant did was use a FIFO method. It's assumed that as he made sales after the fraud, the first sales were the ones that were lawfully acquired shares. But as those shares are dissipated, because it's a smaller amount, he buys far more after the fraud. After the fraud, he then sells, he buys the shares based on fraud and then sells them. He sells them in the market. There's a large block that's sold to the market that he profits from. And no one says that he, that it matters what was the reason for why the market went up. And then he sells another giant block of shares as part of the Best Buy tender offer. And so, but all of the profits on the, on the previous shares that were acquired lawfully are not disgorged. And the district court made that distinction. So that's a clear limit on that. And the causal link? Well, the causal link between shares that are acquired by fraud is he doesn't get to keep any of the profits from shares acquired by fraud. These are unlawful transactions. Right. So the bottom line for the SEC is that the assertion that there has to be a causal link is false. That if it doesn't matter, it doesn't, it makes no difference what the source of the profit may be. If, if you got the shares wrongly, there's disgorgement. That is absolutely, absolutely not our position. Oh, it's not? No, absolutely not, Your Honor. It has to be a but-for cause. And it has to be profits but for the violation. Here, because the transactions themselves are fraudulent, unlawful, but for the transactions you wouldn't have any of these profits. Furthermore, Your Honor, the burden shifting still applies. Second, because I think we may be saying the same thing. I'm not sure, but I want to make sure I understand you. Right. I understand you to be saying it doesn't matter how the money comes in as to those shares. Because he got them in a wrongful way, he's got to give up the profit from it. And there's, there doesn't have to be any causation associated with the price going up. Your assertion of causation, you could call it that, is he got the shares wrongly. And that's what causes him to get a profit. Therefore, it's all subject to being forfeited. Is that right? Yes, Your Honor. But I would add that there's still this burden shifting analysis. The SEC showing can be rebutted by the defense. The defense can show that in the event of proper transactions without fraud or with proper disclosure, the defense can make a showing and say, well, no, this is what happened with the price. Or this is what happened to the price. But that didn't happen here for two reasons. First, TO never disclosed. And second, the other side never offered an expert. They never offered an event study. They never tried to explain what would have happened in the event. And when that is not done, when our initial, the way causality is decided is this burden shifting analysis. We say that that still applies even in the case of fraud. The defendant would still try to do that. Did the district court do that? I understood the district court to say, I don't need to speculate about where the money came from here. They're insider trading rules and that's what the district judge said. It was insider trading cases. He said, I don't have to get into that. The law permits me to just say the price went up and it's going to be disgorged. Did I read her opinion incorrectly? The district court mentions the fact that it's impossibly speculative and the district court did not allow proceedings on disgorgement to try to rebut this. They have to request an evidentiary hearing, proffer an expert, do any of those things. That did not happen. Where that does not happen, the initial assumption, presumption that fraudulent transactions, all profits must be disgorged stands. And that's an SEC first city black box wireless. How about their assertion, I understand their argument to be the price went up having nothing to do with us. Best Buy comes in from out of left field, they come in, they offer a lot of money, we give our shares up. And that's the cause of any rise in price. I don't understand them to be engaging you on the field of, these were obtained by fraud, therefore, everything goes out the window. I understand them to be engaging or trying to engage on the field of, we had nothing to do with Best Buy. Those guys came in and offered a lot of money, we sold our shares, that's not subject to disgorgement. So is this a case where we have two parties talking past each other? It's that appellants are applying the wrong standard. This is not about the impact on price. The precise impact on the legal trading on the market price is not relevant. That is from SEC versus first city. This is about gains. It's not about what would have happened in the market, which is a question of injury. It's a question of proximate causation. That's not the inquiry here. This is an equitable remedy based on the principles that the wrongdoer is not permitted to retain gains from his wrongdoing to deter securities violations and to restore the status quo that existed before their violations. However, even to the extent that it does matter, you have a case such as Bilzerian. Bilzerian says, I have a real tender offer, I'm putting the company in play. Other people come in and bid up the price. He's looking for someone, a white knight, to come in and offer him more. He doesn't care who the white knight is, just as Teo doesn't care who comes in and buys the company. He shops it around to three other places. He's trying to profit in his own testimony by a change in corporate control and to not show his hand and then profit, achieve massive profits that come from the premium in corporate control. That's exactly what happened here. So his fraud bears fruit. There's no reason why you would say, well, he wasn't responsible for this particular one, neither was Bilzerian, and that's not the point. The point is the goal of the fraud, the goal of the scheme. It is achieved. If you don't discourage those profits, it will encourage people to engage in such a scheme. And his scheme here was? There's two components to his scheme. To lie about his plans for a change in corporate control, which deprives investors who bought shares from him or sold shares to him, or sold shares that they didn't know the true value of. The true value of them was much higher, significant premium. We certainly know the price direction. Let's get into that. When you say that's his scheme, that's his plan, is to not disclose these conversations that he had about, or interests he had in going private in his conversations about the board. How do we know that that's what the jury was looking at? How do we know when you say, oh, it's a 335 violation here. How do we know that that's what the jury was looking at? Well, it's undisputed the second component of this fraud, not disclosing his beneficial ownership, which is a fraud all by itself that's a sanctuary. That's the disclosure. In fact, I'm glad you said that, because let's just even narrow this a little further for a minute. Let's assume that those other pieces were out of the picture, and the one undisputed piece was the only thing we were looking at. The disclosure. Does your theory then crater because you don't have the fraud to rely on? It's not just a disclosure. He intentionally lies to the market about the extent of his ownership. Now, that's important to investors. Hold on. Because it tells them I only own 15%. So you're saying a 13D violation is per se a fraud violation because the Absolutely not. The jury found fraud, 10B, not just 13D, Your Honor. Don't move off the point. Let's consider just a pure 13D violation. Right, perfect. A pure 13D violation, SEC versus First City Financial is your guide. It's just a 13D case, but intent still matters. The reason why is that even if intent is not a prerequisite to 13D or disgorgement, the court can consider intent as an equitable factor, and it does in First City because it's a matter of deterrence. You want to deter an intentional wrongdoer. It also is a scheme to violate 13D. That's what First City Financial says. So the fact that it's intentional can matter even apart from 10B. Stop. Yes. Stop. Sorry. Talk to me about the 13D violation, which you say is the one that's undisputed. And let's assume that that's what the jury was looking at, that one. The 10B violation that is based in a world without 13D, Your Honor, and someone announces in a press release, I'm only on this. You're not answering my question. You're not even letting me finish my question. I'm sorry, Your Honor. Okay? The question to you is, assume we're talking about the 13B violation only. Okay. If that's the only thing in the mix, is it, under existing law, correct to say that everything purchased by this man after he commits the 13D disclosure violation constitutes ill-gotten gains subject to forfeiture, disgorgement? The two answers are, first, yes. Look at SEC versus First City Financial, the D.C. circuit case, which is exactly what happens. And that's the one where you say you still will look at and assume or decide that there's fraudulent intent. The intent matters, even if it's not part of the violation, once you get to the remedies phase for the equitable remedy of disgorgement. The second answer is that the whole burden-shifting analysis would apply, and the 13D violation by itself is not rebutted. And the courts can use as a proxy, as an assumption, that all profits from tainted transactions must be disgorged. And it's not rebutted. Whether there's fraud or not, any transaction tainted by a 13D disclosure violation is subject to disgorgement, is the SEC's position. Any court sitting in equity, no, Your Honor. Any court sitting in equity would consider the factors. For instance, if there is a pure inadvertent failure to file properly, a person just goes from 6% to 9% inadvertently without any intent to violate 13D. There's no scheme. There's no 10B. In those circumstances, a court could consider the intent. But the court could also, as a matter of deterring even unintentional violations, could award disgorgement. What would be the causal link in this?  On the contrary, I understand you to be saying there has to be but-for causation. Yes. So assume it's a 13D violation, and it's a knowing one, as Mr. Teo's was. He doesn't want to show his hand, so he's faking the market out about his influence on the trust. What's the causal link between not telling the market about that and Best Buy's coming in and offering a sum of money? What's the causal link? The causal link, because of this area, is very difficult to explain what would have happened if, just in terms of disclosure, disclosure had made. What the courts do is say, this is a hard area, but the uncertainty of that falls on the wrongdoer. What's hard about this? There's no evidence in the record that Best Buy offered the sum of money it did. Is there? Based on anything that Mr. Teo did or didn't disclose about the trust. Is there a shred of evidence that Mr. Teo's 13D violation drove the Best Buy offer, had any effect on price? It's the SEC's position that that's just the wrong question, Your Honor. And that's what I'm trying to get you to answer. Yes. How is that the wrong question if we're focused on the 13D violation, not the 10B stuff? If it's a pure 13D, we would still just do the burden shifting. The SEC would say, here are the profits on tainted transactions, transactions that you were made, that you engaged in, while not telling the marketplace accurate information. And then we'd stand back and we'd say, now you make your showing. And if they don't? When you say they don't, there's evidence in the record, plenty of it, that the Best Buy stuff had nothing to do with Mr. Teo. Is that not evidence? That might be a harder case, Your Honor. That might be a harder case. It's not this case. And it might be one where the district court has discretion to not award discouragement. And when you say that's not this case, I thought it was this case, that there is evidence in the record, including from the Music Land CEO and others, that, hey, Mr. Teo didn't have, he had nothing to do with the Best Buy stuff. That's in the record. And I don't know of anything that rebutts that in the record. Your Honor, it's not a matter of I just need to disclose. It's, Teo had no right to these shares at all. They were acquired through fraud, any profits from them. Okay. That's the answer. It's the same as insider trading. I got it. Well, it is? Yes. 13D is the same as insider trading? It's a very nice analog. 10B violation of 13D. Okay. Now, I understand you've got your 10B argument. And that's clear to me. Let me ask Judge Slobiter, do you have any questions? No, thank you. Judge Nygard? No. Okay. Thank you very much, Mr. Zeitz. I appreciate it. Ms. Krause, your rebuttal. Your Honor, as to 13D violations, this case is on all fours with Willman. The Second Circuit has addressed exactly these sets of facts. Exactly these facts? Because to hear your opposing counsel talk about it, there's fraud going on here, fraud on the market. That has to be taken into account. And if you take that into account, everything that happens after he gets the shares by fraud or wrongly, that's the but-for cause. What's wrong with that argument? Your Honor, even if we assume that the finding here was 10B, there's not a question whether district courts have equitable power where there is causation. The problem is whether it's 10B or 13D, there is no causal link here. Even in a 10B situation involving, for example, insider trading, which they say is perfectly analogous. Well, the courts have been clear that with insider trading, for example, in SEC versus McDonald, in Donovan versus Beerwit, another Second Circuit case at 754 F2nd at 1057, there still is only disgorgement of those profits that are attributable to the securities violation. It's not simply the purchasing of shares and any profits that arise thereafter. There has to be a link between, for example, the inside information that was the basis for the purchase and that transaction being the thing that has generated the profits to be disgorged. Where that's not the case, there's not even disgorgement in insider trading cases. So is the position that's being pressed on us here just not based in existing law? I'm hearing Mr. Lisitsa say, as plain as a human being can speak, if you got those shares wrongly, if it's, quote, a tainted transaction, then everything that flows after that is causally linked to that and is subject to disgorgement. Your Honor, there is not only no case law that supports that, but it's contrary to the statutory scheme and to the purpose of the Williams Act. If Congress wanted to make a strict liability statute where there's disgorgement of anything during a period of a violation, it knew perfectly how to do that, and it did exactly that, for example, in Section 16B with short-swing profits from those who have more than 10% of beneficial ownership of a company. If there's purchases or sales or sales and purchases within a six-month period, there's automatic disgorgement. They didn't do that in the penalty provision here. They provided for punishment in the form of specific tiers of civil penalties, and as a result, where there's going to be a disgorgement award, it turns on the exercise of equitable power. For that, it can't be punishment. To stay remedial, there's got to be some connection to the actual violation. Why don't you talk for me for just a few moments, if you could, put the four seconds together, about the assertion that the jury found fraud here, and how do we know quite what the jury did under these circumstances? Because that's something you folks have called into question. We don't, Your Honor. Although there was a request for special verdicts below, there wasn't, so it's a general verdict. But as it comes back to this issue of disgorgement, Your Honor, again, whether it is a 10-D or a 13-D, doesn't change the fact that there needs to be actual causation. And when the courts, as in Bilzerian and First City, are talking about tainted transactions, what they're looking at is whether the wrongdoer had some role in causing the profits to go up. And that makes perfect sense when you look at what the Williams Act is about, is providing information to shareholders who are considering a cash tender offer so they know the qualifications and intentions of the party making that offer. All right. Thank you very much. I appreciate the argument from counsel in the case. We'll take it under advisement. Thank you.